**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**John J. BRENNAN, Defendant-Appellant.**

No. 75–3939.

United States Court of Appeals,
Fifth Circuit.

Sept. 13, 1976.
Rehearing and Rehearing En Banc
Denied Oct. 20, 1976.

James M. Russ, I. Paul Mandelkern, Orlando, Fla., for defendant-appellant.

John L. Briggs, U. S. Atty., Jacksonville, Fla., William F. Duane, Harrison T. Slaughter, Jr., Asst. U. S. Attys., Orlando, Fla., for plaintiff-appellee.

Before TUTTLE, AINSWORTH and CLARK, Circuit Judges.

CLARK, Circuit Judge:

A warrantless search of defendant's airplane disclosed the marijuana on which his convictions were based. Its validity is the only issue on appeal. Our rejection of the district court's rationale that the airport at which the search occurred was the functional equivalent of the border requires that we examine the authority of the searching Customs agent. Having concluded that, after *United States v. Almeida-Sanchez*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), Customs agents possess no authority to search on less than probable cause at points removed from the border or its functional equivalent, we have reviewed the facts and circumstances which led to the search to determine whether probable cause and exigent circumstances existed to justify the officers' actions. This final analysis reveals that the search was good, and the convictions are affirmed.

## I.

On April 22, 1976, Drug Enforcement Administration (DEA) agent Dennis Fitzgerald received a telephone call from Douglas Dufresne, a Pan American World Airways pilot. Dufresne told Fitzgerald that he had information leading him to suspect that John J. Brennan "was going to engage in some smuggling activities into the Melbourne Regional Airport." Prior to the call, Fitzgerald had had no dealings with Dufresne and had never heard of Brennan.

On April 25, Fitzgerald and another DEA agent met with Dufresne at his residence. At this meeting, Dufresne described Brennan's plane as a 1969 twin engine Beagle, blue and gold in color, with tail number N569MA, and told the agents that the aircraft was kept in a hangar at the Melbourne Regional Airport. He also recounted a trip to Colombia he had made with Brennan in November 1974, during which the two of them had been arrested by Colombian police and kept in jail for about a month. After investigation and court proceedings, all charges were dropped, and Brennan and Dufresne were allowed to leave Colombia. Dufresne never disclosed the basis, if any, for the arrest and detention. Finally, Dufresne told the agents he suspected that Brennan would install a 55-gallon auxiliary fuel tank in the Beagle to enable him to make a flight to Colombia and back without refueling and that the purpose of the trip would be to smuggle in 1600 or 1700 pounds of marijuana. Dufresne's load estimate was based on his own guess as to the plane's capacity and not on anything Brennan had told him.

On April 28, 1975, Dufresne called Fitzgerald and reported that he had recently talked to Brennan by phone and inferred from the conversation that the smuggling trip would take place within the next two or three weeks. Dufresne stated to Fitzgerald that this inference was based on Brennan's purchase of the plane and insurance for it in the amount of $95,000 at a time when he, Dufresne, had personal knowledge that Brennan was experiencing great difficulty in meeting the day-to-day living expenses of his family. When Dufresne asked Brennan about his expensive purchase, the latter had replied, "I am just doing my thing." Brennan had also requested that Dufresne try to locate a second-hand loran—an overwater navigational device suitable for ship or aircraft

use. Brennan had said the loran was for "his brother's boat."

Fitzgerald confirmed that aircraft N569MA was hangared at the Melbourne Regional Airport. When he contacted the American Embassy in Colombia to investigate the November 1974 arrest of Brennan and Dufresne, he learned that three suspected smugglers, Richard H. Silkie, James King, and Richard Ferrara, had been jailed at the same time, but further investigation failed to establish any relationship between Brennan, Dufresne and the three or what charges had been made against Brennan and Dufresne. The El Paso Intelligence Center was notified to put the tail number of the aircraft into its computer which was used to collect and report possible smuggling-related flight activity.

On May 17, 1975, at approximately 11:00 a. m., Fitzgerald received word that the Beagle aircraft had taken off from Melbourne and was headed in a southwesterly direction. Alleged radar contact with the plane was lost when it entered the air traffic pattern over Miami.[1] Fitzgerald contacted Customs officers headquartered at Tampa, advised them of the Dufresne tips and the flight of N569MA, and requested assistance. An estimated 6 to 7 hours later, two Customs agents, Hays and Miller, were dispatched to the Melbourne airport; they arrived at 5:00 p. m. At approximately 1:30 a. m. on the morning of May 18, the Customs agents sighted a Beagle aircraft moving along the taxiway leading to the hangar normally occupied by the Brennan plane and identified it as N569MA. The plane taxied to the door of the hangar, at which time the agents drove their van to another location near the hangar. During this time, a white male later identified as Brennan exited the hangar and headed toward his nearby automobile. Upon encoun-

tering a Melbourne police officer, Brennan headed back toward the hangar, where he was detained by DEA agents. Agent Hays entered the hangar through its partially open door and approached the plane. Observing through the window of the airplane a number of tightly wrapped packages characteristically used to transport marijuana, he decided to conduct a full search of the plane, which disclosed 60 packages of marijuana totaling approximately 1600 pounds and one bundle containing 466 grams of hashish. Following this discovery, Brennan was arrested.

After a hearing at which this testimony was developed, the district court denied the motion to suppress, ruling that the Melbourne airport is the functional equivalent of the border "with regards to those aircraft actually arriving from outside the United States." The district court characterized the test to be applied to the facts in making the determination of functional equivalency was "whether there was reasonable cause to believe that defendant's plane did in fact arrive from outside the United States." Finally, in applying that test, the court found that "[c]onsidering all factors involved, including the information given the government agents by the confidential informant who had been in close contact with the defendant," reasonable cause existed for such a belief.

## II.

This court must first determine whether the district court was correct in deciding that the search took place at the functional equivalent of the border. If so, the agents were entitled to conduct a full search for contraband without particularized knowledge of what Brennan or his plane was carrying. *Almeida-Sanchez v.*

---

1. At the suppression hearing, Brennan and the Government clashed sharply over the source of the information that the aircraft was actually in flight. Brennan claimed that there was no confirmation that Fitzgerald's order to Agent Wingfield to have the plane's tail number put into the El Paso computer had been carried out and that even if it had been, the information Fitzgerald received May 17, involved multiple

hearsay problems. Despite considerable wrangling over these questions at the suppression hearing, on appeal both sides appear to treat them as questions of the degree of reliability of the information Fitzgerald and his team possessed at that time. The trial court made no explicit factfindings on either the loading of the computer or the tracking of N569MA, if any, on the morning of May 17.

*United States,* 413 U.S. 266, 272–273, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973); *Carroll v. United States,* 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543 (1925). No warrant or showing of probable cause is required to support such searches. The national interests in self-protection and protection of tariff revenues authorize a requirement that persons crossing the border identify themselves and their belongings as entitled to enter and be subject to search.

In writing for the court, Justice Stewart did not define the "functional equivalent" phrase; instead he gave illustrative examples:

> For example, searches at an established station near the border, at a point marking the confluence of two or more roads that extend from the border, might be functional equivalents of border searches. For another example, a search of the passengers and cargo of an airplane arriving at a St. Louis airport after a nonstop flight from Mexico City would clearly be the functional equivalent of a border search.

*United States v. Almeida-Sanchez, supra,* 413 U.S. at 272–73, 93 S.Ct. at 2539. In the first example there inheres a high degree of probability that a border crossing took place and an attendant likelihood that nothing about the object of the search has changed since the crossing. The location of the checkpoint according to the criteria customarily employed by ranking Border Patrol officials minimizes the uncertainty, and statistical study of those passing through the checkpoint gives both the officers on the scene and the reviewing courts a benchmark against which to measure it.[2] In the case of the airport search of the nonstop flight, both assumptions become certainties. Thus, as Justice Stewart pointed out, the search of the nonstop flight "would clearly be" a search at the functional equivalent of the border, whereas a search at a checkpoint "might be"—if the facts and circumstances with respect to the location provided the necessary degree of certainty that persons and objects passing through that location were entering the country unchecked. At *Almeida's* "functional equivalent," there neither is nor need be any evidence pointing to specific persons as "suspects" before they pass through the location.

The Melbourne Regional Airport was not the functional equivalent of the border when Brennan's plane landed and taxied into its hangar. Two factors lead us to this conclusion. First, international flights make up only a small percentage of the traffic at the airport, and there was no attempt by airport officials to screen and separate international flights at takeoff and landing.[3] While it is true that a nonstop flight arriving from outside the country "brings the border with it," the facts here do not furnish any reliable indication that Brennan's flight was international. He filed no flight plan and his only known direction of travel led toward a metropolitan center in south Florida. The assumed international origin, which was crucial in Justice Stewart's nonstop flight example, is simply too attenuated here to support this search as one occurring at a functional equivalent of an international border. Second, the regularity factor emphasized in *United States v. Martinez-Fuerte,* —— U.S. ——, 96 S.Ct. 3074, 48 L.Ed.2d —— (1976), is absent here. At a ground traffic checkpoint, at the end of a ship's gangplank, or at an established Customs station, each encounter between private citizen and public official begins in substantially the same way. The intrusion is minimal, the existence and function of the checkpoint is known to the citizen in advance of his entry into its lanes, there is little discretionary

---

**2.** *See United States v. Martinez-Fuerte,* —— U.S. ——, ——, 96 S.Ct. 3074, 3079, 48 L.Ed.2d —— (1976); *United States v. Baca,* 368 F.Supp. 398, 406–07 (S.D.Cal.1973).

**3.** Customs inspector Joseph Birnbaum testified at the suppression hearing that 23 international flights landed at Melbourne Regional Airport in May, 1975, and that the total number of international flights for a period from May 1, 1974 to May 3, 1975 was 303, or slightly less than one per day. However, the statistics are compiled from voluntary pilot reports and are not subject to any verification procedures.

enforcement activity, and the results of the checking procedure may be reviewed by the courts without distortion of the issue of reasonableness by hindsight knowledge that the search produced the desired fruits, if any, of the stop or search. *See United States v. Martinez-Fuerte, supra,* —— U.S. at ——, 96 S.Ct. at 3082. By contrast, the operation here involved a full search, was not anticipated by the subject, involved discretionary decisions at several levels of authority, and was so particularized to the suspicions of defendant's activities that the success of the search clearly cast an aura of reasonableness on the encounter itself. In sum, this search did not possess the characteristics of a border search or other regular inspection procedures. It more resembled the common nonborder search based on individualized suspicion, which must be prefaced by the usual warrant and probable cause standards, unless the authority of the searching officials is not controlled by *Almeida-Sanchez.*

### III.

■ Thus, the next question is whether the Customs officials involved, because of their status, possessed the authority to search Brennan's plane for contraband at the Melbourne airport without probable cause or a warrant.

This portion of our review must confront the question reserved in *United States v. Freund,* 525 F.2d 873 (5th Cir. 1976), *cert. denied,* —— U.S. ——, 96 S.Ct. 2631, 49 L.Ed.2d 377; *United States v. Soria,* 519 F.2d 1060 (5th Cir. 1975): to what extent is the law of *Customs* searches affected by the Supreme Court's decisions in *Almeida-San-*

*chez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), and subsequent cases involving *Border Patrol* agents.[4] After examining the legislative and judicial history of "border search" authority (particularly the *Almeida-Sanchez* family of decisions) and the policy basis adopted by these authorities, we conclude that after *Almeida-Sanchez* neither agents of the Border Patrol nor of the Customs Service may conduct a search on less than probable cause at a point other than the border or its functional equivalent.

In *Soria* this court distinguished Customs searches from Border Patrol searches during the period prior to June 21, 1973, the effective date of *Almeida-Sanchez.* However, the panel acknowledged that the principal grounds for distinction were the non-retroactive effect assigned to *Almeida-Sanchez* coupled with the statutory and regulatory roles assigned to the Customs and Border Patrol agencies. Pre-*Almeida-Sanchez* searches by Border Patrol agents were governed by statutes, regulations and decisions granting immigration officials unfettered discretion to search any vehicle for aliens within the 100-mile radius of the border. *United States v. Soria, supra,* 519 F.2d at 1062. However, since Customs officials were bound to observe the "reasonable suspicion/border nexus" test even before *Almeida-Sanchez, see id.* at 1062–63, *Soria* simply does not affect today's analysis, which is directed toward determination of post-*Almeida-Sanchez* customs search law.

Customs searches have a longer history than Border Patrol activities. The First Circuit noted in construing the predecessor of the present Customs search statute,[5] that

---

**4.** *Bowen v. United States,* 422 U.S. 916, 95 S.Ct. 2569, 45 L.Ed.2d 641 (1975); *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Peltier,* 422 U.S. 531, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975).

**5.** Search of vehicles and persons

Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or

person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle,

laws conferring the right to search persons and vessels at or near international boundaries have existed since the foundation of the government. *See Lee v. United States,* 14 F.2d 400, 404 (1st Cir. 1926), *rev'd,* 274 U.S. 559, 47 S.Ct. 246, 71 L.Ed. 1202 (1927); Act of July 31, 1789, ch. 5, 1 Stat. 43 (1789). Immigration searches are of considerably more recent vintage. There was no restriction of immigration at all until 1875, and the authority for Border Patrolmen to search was not codified until 1925.[6]

As the number of customs and immigration violations increased, single officers were empowered to investigate both types of crime. In 1959, this court first decided a case involving one of these two-hatted agents, calling the search a "border search," and citing both immigration search and customs search cases. *See United States v. Ramirez,* 263 F.2d 385, 387 (5th Cir. 1959), *citing King v. United States,* 258 F.2d 754 (5th Cir. 1958), *cert. denied,* 359 U.S. 939, 79 S.Ct. 652, 3 L.Ed.2d 639 (1959) (customs);

beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or·otherwise, he shall seize and secure the same for trial.
19 U.S.C. § 482 (1970). *See also* 19 U.S.C. §§ 1481–82 (1970).

6. Powers of immigration officers and employees—Powers without warrant

(a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

(2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States.

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of twenty-five miles from any such external boundary to have access to private lands, but· not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States; and

(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, or expulsion of

aliens, if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest, but the person arrested shall be taken without unnecessary delay before the nearest available officer empowered to commit persons charged with offenses against the laws of the United States. Any such employee shall also have the power to execute any warrant or other process issued by any officer under any law regulating the admission, exclusion, or expulsion of aliens.

\* \* \* \* \* \*

Search without warrant

(c) Any officer or employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power to conduct a search, without warrant, of the person, and of the personal effects in the possession of any person seeking admission to the United States, concerning whom such officer or employee may have reasonable cause to suspect that grounds exist for exclusion from the United States under this chapter which would be disclosed by such search.
8 U.S.C. § 1357 (1970) *formerly* 8 U.S.C. § 110 (1946). The Immigration and Nationality Act of 1924, Act of May 26, 1924, 43 Stat. 153, was amended three times to provide gradually expanded arrest and search powers to immigration officers. *See* Act of February 27, 1925, ch. 364, tit. IV, 43 Stat. 1049 (establishing border and shore patrol, appropriating funds, and giving arrest and search power in border zone); Act of August 7, 1946, ch. 768, 60 Stat. 865 (adding power to arrest for crimes related to illegal immigration where officers have "reason to believe" such violations are occurring); Act of March 20, 1952, ch. 108, § 2, 66 Stat. 26 (adding power to search private lands, but not dwellings, within 25 miles of border). Old § 110 was repealed and replaced by § 1357 in 1952 without comment by the recommending committee. *See* 1952—1 U.S.Code Cong. & Admin. News p. 1653 (1952).

*Haerr v. United States*, 240 F.2d 533 (5th Cir. 1957); *Flores v. United States*, 234 F.2d 604 (5th Cir. 1956) (immigration). A year later, in *Barrera v. United States*, 276 F.2d 654 (5th Cir. 1960), a search by agents acting under authority of the customs laws alone was upheld on the authority of *Ramirez* and *King*; *Haerr* was cited in a footnote. Other circuits alternately distinguished Customs and Border Patrol searches and lumped them together as "border searches" governed by similar, if not identical, considerations.[7]

*Almeida-Sanchez* required probable cause for searches by roving patrols in the vicinity of the border. *See* 413 U.S. at 273, 93 S.Ct. at 2539–40, 37 L.Ed.2d at 602. In *United States v. Ortiz*, 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975), the Court held that searches without warrant or probable cause at traffic checkpoints which were not functional equivalents of the border were constitutionally invalid. In a case decided on the same day, *United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), the Court drew the line between authority to stop and right to search more distinctly:

> When an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion. As in [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 899 (1968)], the stop and inquiry must be "reasonably related in scope to the justification for their initiation." . . .

The officer may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause.

422 U.S. at 881, 95 S.Ct. at 2580, 45 L.Ed.2d at 617. Up to this point, none of the *Almeida-Sanchez* family of cases departed from traditional Fourth Amendment jurisprudence developed in nonborder situations. Rather, they merely applied that jurisprudence in a new context. Searches, wherever conducted, required probable cause. The stopping of persons in vehicles for interrogations and investigations less intrusive than a search could be upheld as reasonable although the officer knew less than enough to give him probable cause to search or arrest.

Then, in *United States v. Martinez-Fuerte, supra*, the Court held that a brief investigatory stop could be conducted at a reasonably located checkpoint in the absence of any individualized suspicion. —— U.S. at ——, 96 S.Ct. at 3084. The basis for the official's breach of the citizen's privacy was found in the countervailing public interest expressed in a border control statute, 8 U.S.C. § 1357, which purported to do away with the warrant and probable cause requirements of the Fourth Amendment. But the Court made clear that its decision rested not on the statute but on another traditional Fourth Amendment exception—the regulatory inspection—by citing six cases or opinions acknowledging or suggesting the existence of such an exception.[8] It

---

7. *Compare United States v. Saldana*, 453 F.2d 352, 354 (10th Cir. 1972) ("broad and unique powers given to customs and immigration officers at international borders and within immediate areas") (dicta); *Jones v. United States*, 326 F.2d 124, 131 (9th Cir. 1963), *cert. denied*, 377 U.S. 956, 84 S.Ct. 1635, 12 L.Ed.2d 499 (1964) (concurring opinion) *with Duprez v. United States*, 435 F.2d 1276 (9th Cir. 1970) (stop of pickup justified under 8 U.S.C. § 1357, but "no one . . . claiming this is a border search"); *United States v. Roa-Rodriquez*, 410 F.2d 1206 (10th Cir. 1969) (Border Patrol stop at Truth or Consequences, N.M., "not a border search").

8. *Almeida-Sanchez v. United States*, 413 U.S. 266, 283–85, 93 S.Ct. 2535, 2544–45, 37 L.Ed.2d 596, 608 (1973) (Powell, J. concurring); *id.* at 288, 289–91, 93 S.Ct. at 2547–49, 37 L.Ed.2d at 611 (White, J. dissenting); *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972) (place-of-business inspection of firearms dealers pursuant to 18 U.S.C. § 923(g)); *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970) (liquor license inspections); *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) (building code inspections under "area warrants"); *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 285, 69 L.Ed. 543, 551 (1925).

further limited its holding by noting that its balance of the interests of the citizen against those of the government dealt neither with searches nor with private dwellings, but to vehicles required only to stop briefly under largely predefined procedures.

The singular characteristic of the Border Patrol cases is that the Supreme Court has chosen in each instance to strike its own balance of Fourth Amendment "reasonableness," without regard to the express terms of 8 U.S.C. § 1357. The Court has not relied on the statute or its implementing regulation, despite its language empowering Border Patrol agents to make warrantless searches and arrests within a reasonable distance of the border and the definition of that distance as 100 air miles. At most, the Court has indicated that the statute identified a potential governmental interest to be balanced against individual rights and affirmed the government's intent to act to protect that interest.[9]

With this historical perspective, then, three factors persuade us that *Almeida-Sanchez* applies equally to Customs and Border Patrol searches. The first is the common origin of immigration search case law and customs search case law in the *Carroll* dicta relating to international boundaries. *See Carroll v. United States, supra,* 267 U.S. at 154, 45 S.Ct. at 285, 69 L.Ed. at 551. As identified there, the interest protected by both statutes is the same: protection of physical or fiscal interests of the United States against introduction of items harmful in themselves or because of their method of entry. In the Customs

context, things like narcotics fall into the first category; others, such as tariff items concealed to avoid payment of duty, make up the latter. Border Patrol agents look for "contraband people," whether they immigrated legally or came in lawfully and overstayed or otherwise became deportable.

The second additional factor, which should be considered in conjunction with the first, is the accompanying governmental interest in judicial economy. In view of the substantial similarities between the government interests to be protected and the consequences to innocent members of the public if the probable cause barrier is lowered, we do not believe the Supreme Court would have created today's intricate analytical structure for Border Patrol cases only. Third, we note that other circuits have assumed, usually without explicit discussion, the applicability of *Almeida-Sanchez* concepts to searches by Customs officials.[10]

In sum, regardless of the officers' status, warrantless searches such as Brennan's must be made on probable cause.

## IV.

Since the search did not take place at the functional equivalent of the border and the officers making the search are entitled to no special status under *Almeida-Sanchez,* we must inquire as to the existence of probable cause to search. We conclude that, through a combination of hearsay information from the tip, preflight corroboration of some of the details, and the on-the-scene corroboration of Brennan's surreptitious

---

9. The circumstance of nonreliance is telling, because the language of the reasonable suspicion/border nexus test draws its quantum-of-knowledge standard from the language of the Customs search statute. On its face, the Customs search statute provides no spatial limitation on the search power. The "border nexus" portion of the test is a later judicial gloss designed to save the statute from patent unconstitutionality. *See, e. g., United States v. Rembert,* 284 F. 996, 1004 (S.D.Tex.1922). *Cf. General Motors Acceptance Corp. v. United States,* 62 F.2d 214 (5th Cir. 1932); *Thill v. United States,* 66 F.2d 432 (9th Cir. 1932); *United States v. One Hudson Coach,* 57 F.2d 539 (W.D. N.Y.1932). However, it antedates *Almeida-*

*Sanchez.* In light of the new dichotomy between searches at the border and searches away from the border that case announces and the court's emphasis on an actual border crossing, *see* 413 U.S. at 271–72, 93 S.Ct. at 2589, 39 L.Ed.2d at 601, the gloss is no longer enough to save the reduced quantum-of-knowledge standard.

10. *See, e. g., United States v. Solmes,* 527 F.2d 1370 (9th Cir. 1975); *United States v. Barbera,* 514 F.2d 294 (2d Cir. 1975); *United States v. Beck,* 483 F.2d 203 (3d Cir. 1973), *cert. denied,* 414 U.S. 1132, 94 S.Ct. 873, 38 L.Ed.2d 757 (1974).

landing at the predicted time and place, such probable cause in fact did exist.

■■ It is settled law that warrantless searches require the same investigative basis in fact or reasonable conjecture as searches under warrant. *See Carroll v. United States,* 267 U.S. 132, 156, 45 S.Ct. 280, 286, 69 L.Ed. 543, 552 (1925). Such information may be supplied in whole or in part by an informant. *United States v. Harris,* 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 822 (1971); *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969); *Aguilar v. Texas,* 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964); *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Where insufficient information about the tip and the tipster is available to justify reliance upon it alone, investigating officers may supplement the tip by surveillance of the subject or corroboration of key elements of the tip from relatively objective sources. Although there is no consensus on the type of information required to corroborate an informant's tip,[11] it is generally agreed that the better practice is to obtain corroboration of incriminating details. *See Spinelli v. United States, supra,* 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 642; Moylan, *Hearsay and Probable Cause*: An Aguilar *and* Spinelli *Primer,* 25 Mercer.L.Rev. 741 (1974). However, an accumulation of innocent detail conforming to the original tip has been held to have corroborative value. *See, e. g., United States v. Holliday,* 474 F.2d 320 (10th Cir. 1973).

■ Neither Dufresne nor his tip met the *Aguilar* standards for informant credibility or informational reliability, even if the modified standards for first-time informants are employed. *See United States v. Bell,* 457 F.2d 1231 (5th Cir. 1973); *McCreary v. Sigler,* 406 F.2d 1264 (8th Cir.),

*cert. denied,* 395 U.S. 984, 89 S.Ct. 2149, 23 L.Ed.2d 773 (1969). Dufresne stated clearly that his belief Brennan was going to engage in smuggling activity was his own extrapolation from a number of factual details. Objectively, the content of the Brennan-Dufresne telephone conversations is insufficient as a basis for search or seizure. Likewise, there is no sufficient basis in the record for crediting Dufresne's conclusions on the basis of Dufresne's reputation alone. Unlike the informant in a typical drug case, Dufresne had no "track record" of prior reliable tips; this case represented his first contact with law enforcement officials and the content of the tip revealed an intimate association with Brennan and his activities. *Aguilar* teaches that (1) the basis of the informant's knowledge and (2) the information justifying belief in the informant as a person or in the intrinsic reliability of his tip must be present in order to justify a search on the basis of the tip alone. *See* 378 U.S. at 114, 84 S.Ct. at 1514, 12 L.Ed.2d at 723. Even though the nature of Dufresne's employment and his direct contact and confidential relationship with Brennan affords a more reliable basis for assuming his trustworthiness and that of his information than would be present if Dufresne were repeating an underworld rumor or did not know aircraft capabilities, the information presented by and about Dufresne in this record falls short of this standard.

Similarly, the advance investigation conducted by DEA officials failed to corroborate enough of the significant details of Dufresne's story to comply with the *Spinelli* formula for curing deficient tips. The fact of Brennan's ownership of a Beagle aircraft, even with the addition of information as to a particular identifying number, is patently insufficient to justify a search; this is precisely the type of innocent detail held to be of insufficient corroborative value in *Spinelli* itself. *See* 393 U.S. at 414, 89 S.Ct. at 588, 21 L.Ed.2d at 642. Dufresne's

---

11. *Compare United States v. Larkin,* 510 F.2d 13, 15 (9th Cir. 1974) (corroboration of suspicious details required); *Thompson v. White,* 391 F.2d 724 (5th Cir. 1968), 406 F.2d 1176, 1178 (1969) (after remand) (corroboration of detail, innocent-appearing in absence of tip, sufficient) *with United States v. Canieso,* 470 F.2d 1224 (2d Cir. 1972) (corroboration of purely innocent detail sufficient).

story about his and Brennan's incarceration in Colombia could have been more valuable, but in view of the ultimate dismissal of the Colombian charge, we find it insufficiently probative of Brennan's future plans to smuggle drugs into the United States to hold that it supplied the informational link missing in the tip. Further, the agents' failure or inability to verify some of the more damaging details reported by Dufresne—the installation of auxiliary fuel tanks, Brennan's precarious financial condition or his indirect attempt to acquire a loran, for example—over a relatively lengthy period preceding Brennan's anticipated date of flight has, if anything, a slightly erosive effect on the believability of Dufresne's account.

Of course, the inability to amass corroborating detail had two effects. One effect was to render it highly unlikely that a valid warrant could have been obtained in advance of May 18. A second and reciprocal effect was to require the additional investigation of Brennan's activities that led the DEA and Customs officials to be on the scene at the Melbourne airport on the morning of May 18. At the point at which the law enforcement officials detected the Beagle aircraft proceeding down the taxiway in the dark with its lights off, at a time almost exactly that predicted by Dufresne in his estimate for the time required for a smuggling flight, the quantum-of-knowledge ring closed around Brennan in the manner approved by the Supreme Court in *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). Through self-corroboration, equivocal information ripened into probable cause on the scene.

In cases where searches are made without warrants, the Supreme Court has decreed that the existence of probable cause must be accompanied by circumstances rendering the warrant procedure impracticable. *Warden v. Hayden,* 388 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967). We believe that those exigent circumstances were present here when Brennan landed at the airport in his Beagle aircraft. Because of its mobility the plane could have been stopped and searched any time after probable cause was generated, *i. e.,* as soon as it was identified on the taxiway. However, an attempt by the agents on the scene to have surrounded the plane on the taxiway might have resulted in alerting Brennan or in injury to the officers or others present at the airport. Accordingly, we do not believe that it was a violation of Brennan's Fourth Amendment rights to allow the chances of escape or armed confrontation with the officers to decrease by permitting him to proceed to his hangar. Further, in a very real sense, this case is analogous to *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Texas v. White,* 423 U.S. 67, 96 S.Ct. 304, 46 L.Ed.2d 209 (1975), and *Warden v. Hayden, supra.* Without holding that an airplane is the legal equivalent of an automobile for purposes of search and seizure, we note that the slightly greater difficulty of getting away from the scene in an airplane occasioned by the need to achieve takeoff speed is offset by the 360-degree range of airborne escape routes. As in *Warden v. Hayden,* and in contradistinction to *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 554 (1971), the officers followed Brennan into the place of search with relatively little elapsed time. *See also United States v. Santana,* — U.S. ——, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976). We note further that both the car and the panel truck outside the hangar were registered to Brennan. Since one person cannot drive two cars at once, and since it is unlikely that one person would conduct an entire smuggling operation involving 1600 pounds of marijuana alone, the record supports the reasonableness of an inference by the agents that confederates might be present, with an attendant danger of destruction or dispersion of the evidence if the warrant procedure had been followed. *See Guzman v. Estelle,* 493 F.2d 532, 536–38 (5th Cir. 1974); *United States v. Scott,* 520 F.2d 697 (9th Cir. 1975), *cert. denied,* 423 U.S. 1056, 96 S.Ct. 788, 46 L.Ed.2d 645 (1976); *United States v. Holland,* 511 F.2d 38 (6th Cir.), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2401, 44 L.Ed.2d 669 (1975); *United States v. Lewis,* 504 F.2d 92,

**722**

102 (6th Cir. 1974), *cert. denied*, 421 U.S. 975, 95 S.Ct. 1974, 44 L.Ed.2d 466. Accordingly, we hold that on the facts presented by this case, both probable cause and exigent circumstances were presented to the law enforcement officers at the Melbourne Regional Airport and that the search of Brennan's plane was justified under traditional Fourth Amendment standards. Therefore the motion to suppress was properly denied and the convictions are

AFFIRMED.