UNITED STATES of America, Appellee,

v.

Nedim BILIR, Appellant.

UNITED STATES of America, Appellee,

v.

Ziya SOKUM, Appellant.

UNITED STATES of America, Appellee,

v.

Nail AKDENIZ, Appellant.

Nos. 77–2584–77–2586.

United States Court of Appeals,
Fourth Circuit.

Argued Sept. 11, 1978.

Decided Feb. 8, 1979.

Roger E. Zuckerman, Washington, D. C., for appellants in 77–2585 and 77–2586.

Andrew Jay Graham, Baltimore, Md., for appellant in 77–2584.

Kurt L. Schmoke, Asst. U. S. Atty., Baltimore, Md. (Russell T. Baker, Jr., U. S. Atty., Baltimore, Md., on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and WINTER and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge:

Nedim Bilir, Ziya Sokum, and Nail Akdeniz appeal their respective convictions on single counts of conspiracy to import heroin; possession of heroin with intent to distribute; and conspiracy to distribute heroin.[1] Having failed on various pre-trial motions to suppress critical evidence, they preserved their exceptions to its admissibility and submitted to a joint bench trial on facts stipulated subject only to the exceptions. Found guilty and given substantial prison sentences on the counts indicated, they concede on appeal the sufficiency of the evidence received to sustain their respective convictions, and renew here their challenges on constitutional grounds to the admissibility of certain of the evidence: a quantity of heroin seized in a warrantless search of a suitcase in Sokum's possession; information acquired incident to an arrest of Akdeniz some time before the search; and statements made by Sokum to arresting officers after the search; together with all other received evidence derivative from these. Finding no prejudicial error in the admission of any of this evidence, we affirm.

## I

The factual background out of which these convictions grew is somewhat involved, but because many of its elements bear importantly upon the constitutional arguments advanced, it is necessary to recount it in some detail. It is the saga of a chase, remarkable among other things for its length, and for the sheer indomitability displayed throughout by both pursuers and pursued: the pursuers driven by duty, the pursued presumably by avarice, as the former attempted to intercept, the latter to introduce into this country for sale, a substantial quantity of heroin.

The saga began on May 25, 1977 with the receipt by the International Office of the

1. They were indicted on varying combinations of: conspiracy to import heroin, 21 U.S.C. § 963; conspiracy to distribute and possess with intent to distribute heroin, 21 U.S.C. § 846; importation of heroin, 21 U.S.C. § 952; and aiding and abetting importation, 18 U.S.C. § 2; distribution of heroin, 21 U.S.C. § 841(a)(1); possession with intent to distribute heroin, 21 U.S.C. § 841(a)(1); and aiding and abetting the possession with intent to distribute, 18 U.S.C. § 2. An indicted co-conspirator, Raif Kandemier, entered a guilty plea to one count among those charged, and is not involved in this appeal.

Drug Enforcement Agency (DEA) of information that a quantity of heroin was concealed aboard the Turkish ship *M/V General A. F. Cebesoy* (CEBESOY), then scheduled to visit various American ports of call; that the heroin was then in possession of two seamen aboard the ship, one of them the defendant Nedim Bilir; and that these two would control it on board and effect delivery in the United States to two or more persons of Greek or Turkish extraction. DEA agents determined to place the ship under continuous surveillance in an attempt to foil the attempt and apprehend the participants. Surveillance was begun in Savannah, Georgia, CEBESOY's first port of call in this country, by DEA special agent Counihan and Customs Patrol officers. Two persons, later identified as the defendant, Nail Akdeniz, and one Bahtiyar Karagoz, approached the ship and told a customs agent, posing as a guard, that they wished to visit Karagoz's uncle who was supposed to be a cook on the ship. They were allowed to enter the area of the ship, walked around, but did not go aboard. They then left the port area and the federal agents followed them, the suspects in a black Ford Thunderbird with New York tags registered to Akdeniz. After awhile Karagoz left the Thunderbird, and returned to the port area in a taxi. Again telling the guard he was looking for his uncle, Karagoz entered the area of the CEBESOY, went up the gangplank and met the defendant Nedim Bilir at its top. They went into the ship for about an hour. Karagoz then left, returned to downtown Savannah and met Akdeniz. While the CEBESOY was docked in Savannah, the suspects, including now Bilir, met on a number of occasions in that port city under the surveillance of the federal agents.

The night before the CEBESOY was to leave, Bilir attempted to drive the Thunderbird and damaged it in a wreck. He and Karagoz were arrested by the Savannah police, Bilir for driving without a license and while intoxicated, Karagoz for offering one of the policemen a $100 bribe. The federal agents conveniently arranged for their release.

The CEBESOY then sailed to Jacksonville, Florida and the suspects Akdeniz and Karagoz followed in the Thunderbird under the agents' surveillance. Because their departure was delayed while the car was being repaired and because the CEBESOY left Jacksonville early in an attempt to make up some of the time lost in Savannah, the suspects arrived in Jacksonville just as the ship was sailing from that port. Undaunted, the two headed in the general direction of Texas, CEBESOY's next destination. Surveillance of the car was maintained for awhile after it left Florida going west, but was discontinued before the CEBESOY next made port in Texas. After failing to find dockage in Houston, the ship put into Galveston, where it anchored offshore, thus preventing surveillance while there. The Thunderbird was spotted by the agents in Galveston, and Akdeniz and Karagoz were seen with it. When the CEBESOY sailed for New Orleans, the Thunderbird was followed from Galveston, through the Houston port area, to New Orleans. From there the suspects, still in the Thunderbird, headed north through Louisiana away from all the Gulf Coast ports.

The federal agents followed, but because of difficulty in keeping up, and because of the possibility that the heroin might have been removed from the CEBESOY in Galveston, decided to stop and arrest the suspects. The subsequent search produced no contraband. The suspects told the authorities that they were on their way to California for vacation. When the local U.S. attorney would not press charges, the suspects were released.

In light of the possibility that the heroin had already been smuggled into the country and the fact that the authorities had now tipped their hands, surveillance of the suspects was temporarily discontinued and efforts were concentrated on Baltimore, the CEBESOY's last port of call in the United States. Uniformed customs agents were stationed at the gangplanks in each of the CEBESOY's remaining ports of call other than Baltimore in the hope that this, together with the two arrests that had al-

ready occurred, would discourage any attempts to bring the heroin into the country at those places, and force an effort in Baltimore.

Surveillance was reinitiated in Baltimore on July 6, 1977, where a New York licensed taxicab, registered to Karagoz, was spotted at a Holiday Inn and placed under surveillance. After the CEBESOY docked, Bilir left the ship and met Akdeniz and the defendant Ziya Sokum in downtown Baltimore. From here the suspects left in a taxi, temporarily eluding the agents, who had been away from their own cars and were unable immediately to follow. The agents returned to the CEBESOY where soon the suspects were observed to return and board the ship. About an hour and a half later, at around 11:00 p.m., Akdeniz and Sokum left the ship. Sokum had worn a tight fitting yellow T-shirt when he boarded the ship, but when he left he was wearing a long sleeved, loose fitting blue shirt worn outside his pants. The agents recognized his attire as a style frequently used to "body-carry" drugs so as to hide any bulges. The three suspects were taken in a taxi driven by a DEA agent posing as a cab driver to a bar, which Sokum entered, returning in two or three minutes, and from there they were taken to a hotel. There, Akdeniz and Sokum were observed to enter a room between 11:30 and 11:45 p.m., having apparently checked in earlier. Bilir left the hotel and eventually returned to the CEBESOY. At this point the federal agents were in some doubt that the heroin had been brought from the CEBESOY,[2] but they continued their surveillance. The hotel room was kept under constant external observation until Akdeniz and Sokum left it to check out. On one occasion, Sokum and Akdeniz left the room, but were watched while outside the room. On another occasion, Sokum came out, got some ice from the ice machine, and took it to the room. The agents saw no other material taken into the room by the two room occupants or any other persons.

About 5:00 a.m. on July 7, agent Counihan learned from the hotel desk that the suspects had registered under hispanic names and had given a Wilmington, North Carolina address and listed a fake North Carolina license number. He also learned that they had requested a wake up call for 5:00 a.m. About 5:15 a.m. Akdeniz and Sokum, the latter now carrying a suitcase the size of an overnight bag, checked out of the hotel and entered a taxi, again driven by a DEA agent. The bag had not been observed before nor had the jackets the men were wearing; so it was assumed that these had been placed in the room prior to their observed entry on the previous evening. Akdeniz and Sokum told the driver that they were going to New York and he took them to the Pennsylvania Railroad Station in downtown Baltimore. Sokum was overheard purchasing two tickets to New York on a train leaving at 6:30 a.m. The two suspects then met and about that time Akdeniz recognized Counihan as the person who had arrested him in Louisiana. The suspects separated, Akdeniz starting toward an exit and Sokum with the suitcase heading toward the boarding area. Counihan apprehended Akdeniz, and at some distance away, Supervisory Customs Patrol Officer Porter stopped Sokum and questioned him. Sokum said he was in Baltimore to visit a friend known only as Joe, denied knowing Akdeniz and denied having been aboard any ships. After requesting permission to search the suitcase and receiving no response, Porter attempted to open the case but it was locked. Upon request, Sokum produced the key and Porter opened the bag. Eleven bags containing 13.4 pounds of a powder later identified as practically pure heroin were found.

All three suspects were then taken to the DEA field office where, after being given the appropriate *Miranda* warnings, they were questioned.[3] During the course of

---

2. The DEA agent posing as cab driver who drove the three suspects from the dock to the hotel was at that time doubtful that Sokum had effected the body-carry. App. 84.

3. Because of language difficulties had by Bilir and Akdeniz, the Government made no attempt to use statements given by these two defend-

this interrogation, Sokum admitted bringing the heroin from aboard the CEBESOY onto the mainland by a "body-carry." The indictments and convictions here appealed then followed.

## II

The decisive issue on this appeal is whether the warrantless search and seizure that produced the heroin in the Pennsylvania Railroad Station was justifiable as an "extended border search."[4] The district court held that it was, and we agree with that conclusion. Considering this to be completely dispositive of the appeal,[5] we address only that issue in the remaining portion of this opinion.

Any customs officer of the United States is authorized by 19 U.S.C. § 482 to

> search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if [he] shall find any merchandise . . . in any such trunk or envelope, which he shall have reasonable cause to believe . . . to have been unlawfully introduced into the United States, whether by the person in possession or charge . . .

or otherwise, he shall seize and secure the same for trial.

 Within constitutional limits not yet fully developed, this statutory authorization expresses the well recognized border search exception to the ordinary warrant and probable cause requirements of the Fourth Amendment. *See Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). Border searches by customs officers may be based merely upon "reasonable" rather than "probable" cause and without the necessity of a judicial warrant because of the "primordial" national interest in protecting the borders against violation by illegal importations. *See Alexander v. United States,* 362 F.2d 378, 382 (9th Cir. 1966). The national interest here is deemed sufficiently powerful when balanced against the right of the "individual lawfully within the country to be free of unreasonable searches and seizures," to justify imposition of this much less stringent standard for conducting customs searches and seizures. *Carroll v. United States,* 267 U.S. at 153–54, 45 S.Ct. at 285. While the justification for the relaxed standard is at its clearest with respect to searches at regular customs stations literally "on the border,"[6] it has long been recognized to apply

---

ants after they received warnings through an interpreter.

**4.** The Government also sought to justify the search as one based upon probable cause and exigent circumstances, and challenged the standing of Bilir and Akdeniz to object to the search. Because we decide that the search was justified as an extended border search we do not reach those issues. *See Ashwander v. TVA,* 297 U.S. 288, 346–47, 56 S.Ct. 466, 80 L.Ed. 688 (1936) (Brandeis, J., concurring).

**5.** Defendants also challenged the admissibility of all evidence produced by the abortive encounter of the Government agents with defendant Akdeniz in Louisiana, and of the post-search incriminating statement made by Sokum under custodial interrogation. The Louisiana encounter evidence was challenged as having been obtained incident to an unconstitutional arrest, and as having prejudiced defendants both through its use as evidence probative of guilt and as a part of the fabric of information upon which the requisite suspicion to justify the Baltimore search was constructed. We consider that prejudicial error was not shown in either respect. In both, it was merely

cumulative of other evidence manifestly sufficient for the purpose, and was thus harmless beyond a reasonable doubt. Sokum's post-search statement was challenged simply as having been tainted by the allegedly unconstitutional prior search. This challenge of course falls with our determination that the search was a valid one.

**6.** Searches at the very borders are essentially reasonable *per se,* so that the Fourth Amendment's protection against *unreasonable* searches and seizures is not implicated, and the controlling standards are those of the statute alone. *See United States v. Ramsey,* 431 U.S. 606, 616–19, 97 S.Ct. 1972, 52 L.Ed.2d 612 (1977). The cited statute's literal assertion of an unlimited geographical and temporal extension of border search authority in the phrase, "wherever found," is assuredly subject to ultimate constitutional constraints. While these have not yet been definitively addressed by the Supreme Court, see note 13 *infra,* we assume in this opinion that once away from the approximate borders, constitutional as well as statutory constraints of reasonableness apply.

as well to so-called "extended border searches," under which "border" is given a geographically flexible reading within limits of reason related to the underlying constitutional concerns to protect against unreasonable searches. *See, e. g., Castillo-Garcia v. United States,* 424 F.2d 482 (9th Cir. 1970). The many difficulties that attend the attempt to intercept contraband and to apprehend increasingly mobile and sophisticated smugglers at the very borders of the country have of course given birth to the doctrine. It holds that some searches by customs officials, although conducted at points physically away from an actual border and removed in time from the precise time of importation, may nevertheless be treated as border searches. *Id.* (citing cases). The test of validity is one of reasonableness under the circumstances. For this, no rigid formula can be prescribed. Time and distance factors may be of importance, but are not alone decisive. Ultimately the question is simply whether under all the circumstances—time and distance factors included—the customs officials had a reasonable basis for the suspicion leading to the search away from the actual border.

*See United States v. McGlone,* 394 F.2d 75, 78 (4th Cir. 1968). Their suspicions must be reasonable not only with respect to the nature of the material seized,[7] but to the fact that it has indeed illegally crossed a border within a reasonably recent time. *See United States v. Weil,* 432 F.2d 1320, 1322–23 (9th Cir. 1970).

Examination of the cases in which the doctrine has evolved reveals two general patterns. Sometimes the first contact with a suspect, hence the first opportunity to search, occurs away from the actual border. In this circumstance, the suspicion that he possesses material that has recently crossed a border will ordinarily be wholly circumstantial, and time and distance factors may be quite crucial in assessing reasonableness of suspicion.[8] Much more commonly, the search away from the actual border results from deliberate delay by customs officers who have observed an actual border crossing by known suspects but who then follow and only conduct their search at some distance from the border despite repeated intervening opportunities.[9]

7. That it is indeed dutiable or contraband material.

8. *See, e. g., United States v. McGlone,* 394 F.2d 75 (4th Cir. 1968) (suspects first encountered in parking lot near dock area); *United States v. Beck,* 483 F.2d 203 (3d Cir. 1973) (suspect observed leaving border area; search after short chase); *United States v. Glaziou,* 402 F.2d 8 (2d Cir. 1968) (same).

9. This delay may be for either or both of two primary purposes. Sometimes the primary purpose is to bolster by further observation of the suspects' activities a suspicion that is arguably marginal at the time the border crossing was observed. *United States v. Brom,* 542 F.2d 281 (5th Cir. 1976) (search only after suspicious activities inland of border); *United States v. Flores,* 531 F.2d 222 (5th Cir. 1976) (same). Much more frequently, the delay is prompted primarily by the hope of apprehending smuggling accomplices inland of the border, notwithstanding a suspicion (or plain knowledge) at the time of the observed border crossing that would clearly have justified the search then and there. *See, e. g., United States v. Fogelman,* 586 F.2d 337 (5th Cir. 1978) (search 254 miles and 20 hours from observed border crossing); *United States v. Martinez,* 481 F.2d 214 (5th Cir. 1973) (search 150 miles and 142 hours

from observed border crossing); *Alexander v. United States,* 362 F.2d 379, 382 (9th Cir. 1966) (purpose articulated and approved).

While the cases considering these different patterns have not typically articulated specifically different constitutional concerns for each, it is clear that each does raise somewhat different problems in assessing the reasonableness of the ultimate search and seizure. See Judge Waterman's intimations in *United States v. Glaziou,* 402 F.2d at 13 n.3. With respect to the delayed search where the suspicion is sufficiently strong to justify a search at the actual border but it is nevertheless delayed, some judicial concerns have recently been expressed in the Fifth Circuit about the constitutionality of an ensuing warrantless search. *See United States v. Fogelman,* 586 F.2d at 350–52 (Godbold, J., dissenting); *United States v. Mitchell,* 525 F.2d 1275, 1278–79 (5th Cir.), *vacated on the extended border search point,* 538 F.2d 1230, 1234 n.4 (5th Cir. 1976) (en banc). We express no opinion on the validity of these concerns, considering them in any event not applicable in this case where, as developed in the text of this opinion, the delay was motivated in major part by a felt need to make suspicion more reasonable by further observation.

■ This case clearly involves a deliberately delayed search. With respect to these, the most important single factor in assessing reasonableness of the eventual search is the extent to which continuous surveillance of suspects (or of suspected vehicular carriers) has been maintained from border crossing to search location. *See United States v. Fogelman,* 586 F.2d 337 (5th Cir. 1978). Time and distance factors considered apart become less relevant. To the extent continuous surveillance has been maintained, the suspicion that what is being seized away from the border did indeed cross the border is of course made more reasonable. Most importantly to the underlying Fourth Amendment concerns, continuous surveillance in this pattern of official conduct gives assurance that the customs search with its relaxed standards will not be employed, by design or blunder, against persons or objects that in fact have never been the legitimate targets of a border search. In the words of Judge John R. Brown, continuous surveillance "maintain[s] the integrity of the border conditions keeping the search and seizure within the governmental necessities of the border . . . without trespassing upon the precious rights of the millions of Americans who scurry to and fro on the nation's highways . . . ." *Id.* at 350 (concurring opinion) (citation omitted).

■ Within this doctrine, the delayed search and seizure in this case, made some three to four miles from the actual border, some seven hours after the observed border crossing; delayed primarily by a desire to confirm developing suspicion; and following practically continuous surveillance in the interval, was a constitutionally permissible extended border search. The time and distance factors considered alone lie well within acceptable parameters.[10] More importantly, the suspicion upon which Customs Officer Porter finally acted was reasonable under the circumstances on the two critical points: that the suitcase might contain heroin, and that if so it had quite recently crossed the border at the Baltimore docks. At that time Porter was privy to the information that initiated the long chase and to all the corroborating knowledge acquired in its course: the predicted contact between the seaman Bilir and the mainland suspects of Turkish extraction; the dogged following of the CEBESOY from port to port by the latter; the convergence on Baltimore of Bilir, Akdeniz and Sokum and their departure from the CEBESOY after Sokum's change of clothing. In the railroad station he observed the culminating events that gave substantial confirmation to the continuously developing suspicion: the purchase of tickets for New York; the sudden attempt to flee upon recognition of Agent Counihan; and the false answers given him by Sokum just before the search. Finally, the practically continuous surveillance from ship to railroad station provided him substantial assurance that if contraband were to be disclosed by the search, it had been in Sokum's possession when he came across the border from the CEBESOY some seven hours earlier. Within the meaning of 19 U.S.C. § 482, the suspicion upon which the search was conducted was reasonable, and the seizure valid within the extended border search doctrine.

### III

■ It remains necessary to address a central contention advanced by defendants on this appeal: that the extended border search doctrine that we apply here has been effectively rejected by the Supreme Court in *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). That case considered the constitutionality of a provision of the Immigration and Nationality Act, 8 U.S.C. § 1357(a)(3), that authorized officers of the Border Patrol to conduct warrantless searches "within a reasonable distance from any external boundary of the United States." The Supreme Court there held a marijuana-producing search of an automobile by a roving border patrol some 25 miles away from the

10. See cases cited in note 9 *supra.*

border unconstitutional under the Fourth Amendment. Pointing out that the search in question was not conducted at the border or any "functional equivalent" [11] of the border, where warrantless searches might have been appropriate, the Court held that a search of the type before it could only be supported by probable cause or by consent. Drawing on this case and a Fifth Circuit case, *United States v. Brennan,* 538 F.2d 711 (5th Cir. 1976), that held *Almeida-Sanchez* applicable as well to Customs Patrol searches, the defendants contend that customs officers' authority to conduct warrantless searches is now confined to those conducted at an actual border or its functional equivalent.[12] We are not so persuaded. Assuming that *Almeida-Sanchez* does apply as well to customs officers' authority to search without warrant, we do not read it to prohibit either type officer from conducting extended border searches of the kind here made. The roving border patrol search in *Almeida-Sanchez* would clearly not have qualified as an extended border search by either type officer. It lacked the critical element that primarily justifies the extended border search: a reasonable suspicion that material recently illegally imported would be disclosed by the search. The unconstitutional conduct struck down in *Almeida-Sanchez* thus lay well outside any then permissible under extended border search doctrine. We therefore do not read

the case to have abrogated that doctrine either directly or by necessary implication.[13]

*AFFIRMED.*

WINTER, Circuit Judge, dissenting:

While I agree with much of what the majority says, I disagree as to the precise disposition of these cases. I respectfully dissent.

I.

Unlike the majority, I believe that *United States v. Almeida-Sanchez,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), is controlling. *Almeida-Sanchez* taught that, in the interest of national protection, warrantless searches may be conducted only at the border or at its "functional equivalents." *Id.* at 272–73, 93 S.Ct. 2535. Though *Almeida-Sanchez* dealt specifically with searches by Border Patrol officers, it has since been applied to Customs agents. *See United States v. Gallagher,* 557 F.2d 1041, 1043 (4 Cir. 1977) (per curiam); *United States v. Brennan,* 538 F.2d 711, 716–19 (5 Cir. 1976). Because the search here did not take place at the actual border, the validity of the search depends on the characterization of the site as the functional equivalent of the border. I conclude that the site of the search cannot be so characterized.

The location of a search may be considered the functional equivalent of the bor-

11. The "functional equivalent" sub-category includes searches made at points inland of national borders under circumstances other than continuous surveillance that guarantee preservation of border-crossing conditions at the point of search. *See, e. g., United States v. Gallagher,* 557 F.2d 1041 (4th Cir. 1977) (per curiam) (search at distant customs station of item put under customs seal at border). The underlying principle that permits them to be treated as border searches is thus the same as that for extended border searches. Courts may in fact be using the terms interchangeably. *See* note 12 *infra.*

12. Defendants' argument is in effect that by its failure to include "extended border searches" along with searches "at the border itself" and "at its functional equivalents" in describing permissible warrantless searches the Court was thereby deliberately disapproving the "extended border search" as well as the "roving pa-

trol" search actually before it. This, we think, reads far too much into this illustrative dictum. It is not clear in any event that the Court did not intend to include "extensions of the border" as developed in extended border search doctrine within the "functional equivalent" reference.

13. Other circuits, including the Fifth Circuit in a case decided after *Brennan,* agree with this perception. *See United States v. Beck,* 483 F.2d 203, 208 (3d Cir. 1973); *United States v. Fogelman,* 586 F.2d 337, 349 n.4 (5th Cir. 1978) (Brown, C.J., concurring). Furthermore, the Supreme Court has indicated since *Almeida-Sanchez* that it considers still open the question of the geographical limits to which the border search authority embodied in such statutes as 19 U.S.C. § 482 may constitutionally be taken. *See United States v. Ramsey,* 431 U.S. 606, 615 n.11, 97 S.Ct. 1972, 52 L.Ed.2d 612 (1977).

der only if the factors which make a border search reasonable are present. *See Brennan, supra* at 714–16. *Brennan* isolated two such factors: the international origin of the object seized and the regularity of the inspection procedure. Thus, one circumstance which makes searches at a border reasonable is the certainty that the objects of those searches have come from outside the country. Another circumstance is the fact that inspections are ordinarily conducted at the border, where an entrant has no reasonable expectation of privacy. Neither of these circumstances was present in the instant cases.

The search here occurred at a railroad station some miles inland of the border and over seven hours later than the actual border crossing. To ensure the international origin of the goods seized, continuous surveillance from border crossing to search location was required. This is especially so since heroin was not found on the person or among the effects of Bilir, who shipped aboard the CEBESOY, but in the suitcase carried by Akdeniz and Sokum, who had been in the United States for an extended period of time. Where the majority and I differ is whether the surveillance was "practically continuous," as the majority characterizes it, or whether, as in my view, the gaps in surveillance were so significant that it was not reasonable to assume that Sokum and Akdeniz were carrying goods that had quite recently crossed the border at the Baltimore docks.

The record made at the suppression hearing shows these facts: At about 8:00 p. m. the night of July 6, 1977, Bilir was observed coming off the CEBESOY. He took a taxicab to the Hilton Hotel where he met Akdeniz and Sokum. The three got into another taxicab and the agents were unable to follow them. The agents returned to the ship and at approximately 10:00 p. m. they observed Akdeniz and Sokum go aboard. Bilir had boarded earlier, unobserved by the agents. Sometime after 11:00 p. m., all three were seen to leave the ship. Sokum was dressed in a loose-fitting shirt different from that which he wore when he boarded the ship earlier in the evening. But neither Sokum nor Akdeniz displayed any bulges or other suspicious aspects of their appearance indicating a "body-carry" of a substantial quantity of heroin or other substance. The agents who observed them leave the ship did not think that Sokum had effected a body-carry.

The three entered a taxicab driven by a government agent and they were driven ultimately to the Marylander Motel, but in route they stopped at a bar where Sokum entered and remained, unobserved, for two or three minutes. When they arrived at the Marylander Motel, Akdeniz and Sokum went to room 51 in which they had registered previously, and Bilir left and returned to the ship. Akdeniz and Sokum were kept under surveillance until the next morning when they left the motel, entered a taxicab driven by a government agent and were transported to the railroad station, as the majority relates. When they left the motel, Akdeniz and Sokum were carrying a suitcase which had not theretofore been observed by any agent.

From the time that Bilir, Akdeniz and Sokum met at the Hilton Hotel until Akdeniz and Sokum were apprehended at the railroad station, there were these breaks in the chain of surveillance: (1) as to Akdeniz and Sokum, a break of one or more hours between the time that the agents lost sight of them at the Hilton Hotel until the agents saw them board the ship; (2) as to Bilir, a break of two or more hours between the time that the agents lost sight of him at the Hilton Hotel until he was seen to leave the ship in the company of Akdeniz and Sokum; and (3) as to Sokum, a further break when, in route from the ship to the Marylander Motel, he entered a bar and remained for two or three minutes. Perhaps more importantly, neither room 51 of the Marylander Motel nor Akdeniz and Sokum was under surveillance prior to the time that they checked into the motel.

Since the reasonableness of the belief of the arresting agents that, at the railroad station, Akdeniz and Sokum were transporting material which had been imported

744

depended upon a theory of Bilir passing heroin to Akdeniz and Sokum, the significance of the breaks is obvious. Bilir may well have had access to an unknown person or persons, other than Akdeniz or Sokum, in the time that he was out of sight of the agents. Thus, if he subsequently passed heroin, he may have obtained it from a domestic rather than a foreign source. Before they met Bilir, Akdeniz and Sokum may have had access to many unknown persons and obtained heroin from them. After they were observed meeting Bilir, Akdeniz once, and Sokum twice, may have had access to an unknown person or persons other than Bilir and obtained heroin from them. Thus there were significant opportunities for Akdeniz and Sokum to obtain heroin other than that which may have been imported by Bilir. While the agents may have had strong *suspicion* that Akdeniz and Sokum were transporting goods that had been imported by Bilir, these were not grounds for a *reasonable belief* that this was true.

Nor did the search occur under circumstances comparable to a border search where the person who crossed the border has a diminished or non-existent expectation of privacy. Although the agents had no greater reason to believe Akdeniz and Sokum were carrying contraband at the time of the search than when all three defendants disembarked, no search was undertaken immediately after the border crossing. Instead, seven hours later and some distance away from the border, the search was made in a local railway station, and then only when one of the agents had been recognized. Under the majority's holding, if we assume that Akdeniz and Sokum had not been spotted and that constant surveillance was maintained, a search in New York, or at some future destination, would have been justified under the border search doctrine. I cannot think that the doctrine is without geographical or temporal limit to that extent.

In sum, I can only conclude that the search at the Pennsylvania Railroad was not a search at the border or its functional equivalent within the meaning of *Almeida-Sanchez.* In the words of the Fifth Circuit,

this search did not possess the characteristics of a border search or other regular inspection procedures. It more resembled the common nonborder search based on individualized suspicion, which must be prefaced by the usual warrant and probable cause standards . . . .

*United States v. Brennan,* 538 F.2d 711, 716 (5 Cir. 1976). Moreover, even if *Almeida-Sanchez* is not applied, I cannot concur in the majority's determination that the searching officers had reasonable cause to believe, under all the circumstances, that Sokum and Akdeniz were carrying heroin which had been illegally introduced into the United States aboard the CEBESOY. Because of the several breaks in surveillance, the agents' belief that the goods seized had recently come from outside this country was not reasonable.

II.

I see no merit in the other grounds advanced by the government either to sustain the validity of the search or to defeat defendants' right to test its validity. Having concluded that the agents lacked reasonable cause to believe that Akdeniz and Sokum were carrying heroin that had been illegally imported by Bilir, I do not think that their suspicions met the more stringent standard of probable cause. Nor do I think that there were exigent circumstances to justify an arrest and a warrantless search incident thereto. Since Bilir, Akdeniz and Sokum were all charged with possession of heroin, they had standing to contest the validity of the search. *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

I would hold the search invalid and reverse the convictions, remanding for a new trial.