[611 NYS2d 394]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
VINCENT LePERA, Appellant.

Fourth Department, April 15, 1994

APPEARANCES OF COUNSEL

*John Humann,* Buffalo, for appellant.

*Matthew J. Murphy, III, District Attorney* of Niagara County, Lockport *(Thomas H. Brandt* of counsel), for respondent.

OPINION OF THE COURT

GREEN, J.

After a jury trial, defendant was convicted of possession of gambling records in the first degree (Penal Law § 225.20 [1]). The records had been seized and photocopied by an agent of the United States Customs Service during a border search. Defendant contends that the warrantless seizure was illegal and that his motion to suppress the photocopies of the gambling records should have been granted.

The sole witness at the suppression hearing was the Customs inspector who seized the records. On July 8, 1985, the inspector was working at the Rainbow Bridge in Niagara Falls. Defendant was referred to him by the booth inspector for secondary inspection. The inspector recalled that the reason for the referral was that defendant was driving a Mercedes, "which is a high profile for vehicles being smuggled into the United States or entered illegally." In addition, the ownership had recently been transferred and some of the documents were not available for a quick examination at the booth.

The secondary inspection was conducted at the bridge office. The Mercedes was briefly searched for documents concerning ownership and registration. The inspector then asked defendant to empty his pockets and defendant produced a paper from his pants pocket and a wallet containing a similar paper. The inspector examined the documents and set them aside. He "recognized that, from previous experience, that they may indeed have something to do with betting or gambling records." The inspector was not an expert on gambling, but he had some previous experience with gambling cases and one of the documents resembled a gambling record he had seen in another case. The inspector had only "suspicions" about the documents.

Because of his suspicions, he attempted to contact an officer of the Buffalo Police Department's vice squad. The Customs inspector sought the police officer's advice regarding "what action to pursue at this point from a legal standpoint", as well as assistance in determining whether the documents were gambling records. When he was unable to reach the police officer, the inspector concluded that it "was not possible for me to hold Mr. LePera any longer for the examination purposes. We had determined that the vehicle was legally transferred and for customs purposes that would be the end of the examination."

A computer check had verified that the vehicle was owned and registered in the name of Barbara LePera, as the certificate of title and registration reflected. The vehicle identification numbers on the vehicle also corresponded with those in the registration documents. Having determined that the vehicle was entering the country legally and that it was not possible to hold defendant any longer, the inspector decided to make photocopies of the documents. He had the copies certified by his supervisor and then returned the originals to defendant. He turned over the photocopies to the Buffalo police officer two or three days later.

The suppression court concluded that the inspector was entitled to "search for proper documentation of evidence of ownership to the vehicle." Because the search was properly conducted, the court declined to suppress the copies of the documents seized from defendant.

On appeal, defendant does not challenge the legality of the initial stop or the search of his vehicle. It is well established that the brief detention of persons entering the country and routine inspection of luggage or other property, conducted without a warrant or probable cause, "does not violate the constitutional proscriptions against unreasonable searches and seizures" *(People v Luna,* 73 NY2d 173, 176; *see also, People v Dworkin,* 30 NY2d 706). As the United States Supreme Court pointed out in *United States v Ramsey* (431 US 606, 616): "[S]earches made at the border, pursuant to the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country, are reasonable simply by virtue of the fact that they occur at the border".

Greater intrusions on a traveler's privacy, such as the search of defendant's pockets, must be justified by some level

of suspicion *(see, People v Luna, supra).* Defendant does not question the propriety of the Customs inspector's search of his person for documentation establishing that the Mercedes was entering the country legally. Rather, defendant maintains that the inspector exceeded his authority under the Customs laws by seizing the records and that the seizure is not justified by the relaxation of the usual constitutional restrictions on searches and seizures at the border.

Defendant relies primarily on *People v Regnet* (111 Misc 2d 105). In *Regnet,* the defendants moved to suppress a VISA card seized from the automobile in which they were riding by a Customs officer at the Peace Bridge. Because the name on the VISA card was not that of either defendant, the Customs agent became suspicious and telephoned the bank's credit card authorization department. When he learned that the credit card was stolen, the Customs agent continued to hold the defendants and called the Buffalo police, who arrested the defendants. The court held that the credit card was illegally seized because the Customs agent possessed neither the necessary authority under the Customs laws nor the requisite level of suspicion under the Fourth Amendment to justify the seizure. We agree with defendant that both grounds for suppression are present in this case.

The authority of Customs officers to seize property entering the country is expressly granted in 19 USC § 482. That section provides: "Any of the officers or persons authorized to board or search vessels may stop, search, and examine, as well without as within their respective districts, any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in any manner contrary to law, whether by the person in possession or charge, or by, in, or upon such vehicle or beast, or otherwise, and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law; and if any such officer or other person so authorized shall find any merchandise on or about any such vehicle, beast, or person, or in any such trunk or envelope, which he shall have reasonable cause to believe is subject to duty, or to have been unlawfully introduced into the United States, whether by the person in possession or charge, or by, in, or upon such vehicle, beast, or otherwise, he shall seize and secure the same for trial."

While Congress has granted extensive power to Customs

officers to conduct searches and to seize property at the border, that power is not without limits. The same concerns justifying the expansion of governmental authority to conduct searches and seizures at the border also serve as a constraint on that authority:

"In conferring upon Customs officers such broad authority, circumscribed only by Constitutional limitations of the Fourth Amendment, the Congress has in effect declared that a search which would be 'unreasonable' within the meaning of the Fourth Amendment, if conducted by police officers in the ordinary case, would be a reasonable search if conducted by Customs officials in lawful pursuit of unlawful imports. Judicial recognition of this distinction has given rise to the term 'border search', in order to distinguish official searches which are reasonable because made solely in the enforcement of Customs laws from other official searches made in connection with general law enforcement.

"Validity for this distinction is found in the fact that the primordial purpose of a search by Customs officers is not to apprehend persons, but to seize contraband property unlawfully imported or brought into the United States" (*Alexander v United States*, 362 F2d 379, 381-382, *cert denied* 385 US 977; *accord, United States v Ader*, 520 F Supp 313; *People v Siegfried*, 116 Misc 2d 784, 785).

Customs officials, therefore, are permitted to conduct searches and seizures that would be unreasonable in other contexts so that they can effectively enforce the Customs laws. One of the regulations implementing 19 USC § 482 implicitly recognizes the limits on the authority of the Customs Service to seize property. At the time defendant's records were seized, 19 CFR 162.21 (a) provided, in pertinent part: *"Seizures by Customs officers.* Property may be seized, if available, by any Customs officer who has reasonable cause to believe *that any law or regulation enforced by the Customs Service* [emphasis supplied] has been violated, by reason of which the property has become subject to seizure or forfeiture".

That regulation is in accord with the well-established view that Customs officials have special limited powers to enforce the Customs laws; they do not have the general investigatory or law enforcement authority of police officers *(see, People v Esposito,* 37 NY2d 156, 160). Their purpose in conducting a border search is to ascertain whether merchandise is being unlawfully imported, either because it is brought into the

country without the payment of a duty *(see, e.g., People v Devonshire,* 148 AD2d 965, 966, *lv denied* 74 NY2d 663) or because it is contraband, such as drugs, which is being introduced into this country illegally *(see, e.g., People v Luna,* 73 NY2d 173, *supra; People v Pray,* 199 AD2d 646; *People v Noorzin,* 199 AD2d 69). "It is not the usual search conducted in criminal investigations" *(Klein v United States,* 472 F2d 847, 849).

The People are unable to point to any violation of the Customs laws that would justify the seizure of defendant's papers. The People do not claim that the laws or regulations "enforced by the Customs Service" (19 CFR 162.21 [a]) include Penal Law § 225.20 (1), which makes it a crime in this State to possess gambling records. Nor do the People maintain that any Federal gambling laws *(see, e.g.,* 18 USC § 1955) were violated or that those laws are enforced by the Customs Service. Further, as the Customs inspector correctly concluded, he could not hold defendant any longer when the documentation for the vehicle proved to be satisfactory. At that point, he acknowledged, "for customs purposes that would be the end of the examination" *(see, United States v Modes, Inc.,* 787 F Supp 1466; *People v Regnet,* 111 Misc 2d 105, *supra).*

By going further and seizing the records on behalf of the local police, the Customs inspector exceeded his authority. As the Court of Appeals observed in *People v Esposito (supra,* at 160), the limited border search exception "was granted to customs officials for a particular purpose; it may not be used to circumvent the constitutional requirement of probable cause placed upon police officers" *(see also, People v Regnet, supra).*

It is also significant that, at the time of the seizure, the Customs inspector acted upon nothing more than a vague suspicion that defendant's documents were gambling records. The inspector candidly admitted that he lacked the expertise necessary to determine the nature of the documents *(see, United States v Modes, Inc., supra).* At the time the inspector saw defendant's papers, he had "no right to seize [them] because he 'had no information that a crime had occurred or was about to take place, had not seen defendant do anything criminal, and [was] confronted only by facts susceptible of innocent interpretation' " *(People v Regnet, supra,* at 108,

quoting *People v Howard,* 50 NY2d 583, 590, *cert denied* 449 US 1023; *see also, United States v Modes, Inc., supra).*

The determination that the documents possessed by defendant were illegal gambling records was not made until an expert examined them days later. As it turned out, of course, the documents proved to be gambling records. There is no question, however, that the People may not rely on information subsequently obtained from the Buffalo Police to justify the seizure by the Customs inspector *(see, People v Young,* — AD2d —, 1994 NY Slip Op 2176 [4th Dept, Mar. 11, 1994]). Thus, even if the inspector possessed authority under the Customs laws to seize the documents, the facts available to him at the time of the inspection do not justify the seizure *(see, People v Regnet, supra,* at 109).

Accordingly, the judgment should be reversed, defendant's motion to suppress granted and the indictment dismissed.

DENMAN, P. J. (dissenting). I respectfully dissent. Defendant was the subject of a routine border stop by a United States Customs officer when questions arose concerning ownership of the vehicle he was driving. During the course of a search of defendant's vehicle and personal papers, a search that defendant does not challenge, and that in any event was a proper border search *(see, United States v Ramsey,* 431 US 606, 616; *People v Luna,* 73 NY2d 173, 176), defendant produced two papers. When the officer examined the papers, which defendant and the majority apparently concede he was entitled to do *(see, People v Luna, supra),* the officer noted that they resembled gambling records that he had seen in previous cases. The papers contained columns of names or initials and numbers as well as various references to loans, payments, and baseball games, thus giving rise to reasonable suspicion that they were gambling records. Defendant's conflicting explanations and ultimate reference to an "office pool" served to confirm that suspicion.

Acting on his reasonable suspicion, the Customs officer attempted to contact local police to obtain confirmation that the documents were gambling records. Unsuccessful in that attempt, the officer photocopied the papers before returning them to defendant and releasing him. Subsequently, the Customs officer turned over the photocopies to local police, who commenced prosecution of defendant for possession of gambling records.

The majority concludes that, because the seizure of the

gambling records was outside the scope of the Customs officer's limited authority, it was required to be supported by probable cause and that, because the Customs officer lacked probable cause, the papers must be suppressed. I disagree with that analysis because it makes what I consider an erroneous distinction between gambling records and other contraband, such as drugs, that the majority concedes Customs officers are authorized to seize in the exercise of their duties. No such distinction is supported by the established definition of "contraband", by Federal criminal laws, or by statutes defining a Customs officer's search and seizure authority.

I agree with the majority that Customs officers have limited authority and do not possess general law enforcement powers *(see, People v Esposito,* 37 NY2d 156), but disagree with the application of that principle to this case. In *Esposito,* Customs officers illegally searched the person of the defendant, an airport baggage handler, at the behest of police who were investigating internal airport thefts but lacked particularized suspicion of defendant. *Esposito* is thus distinguishable, both because it did not involve a border search and because the Customs officers there were obviously acting as agents of the police.

I disagree with the majority's conclusion that the Customs officer in this case exceeded his authority under Federal law. It is a Federal crime for an individual knowingly to carry or send "in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event" (18 USC § 1953 [a]; *see also,* 18 USC § 545). Thus, the papers imported by defendant constituted contraband. Customs officers are granted broad statutory authority to search for and seize prohibited or illegally imported goods at the border *(see, Alexander v United States,* 362 F2d 379, 381-383, *cert denied* 385 US 977). In particular, a Customs officer is authorized to "stop, search, and examine * * * any * * * person * * * on * * * whom he or they shall suspect there is merchandise which * * * shall have been introduced into the United States in any manner contrary to law * * * by the person in possession * * * and to search any trunk or envelope, wherever found, in which he may have a reasonable cause to suspect there is merchandise which was imported contrary to law" and, finding same, "shall seize and secure the same for trial" (19 USC § 482). Similarly, 19 USC

§ 1496 grants a Customs officer broad authority to examine the "baggage of any person arriving in the United States in order to ascertain what articles are contained therein and whether * * * [they are] prohibited." Finally, 19 USC § 1595a (c) provides for the seizure of any "merchandise that is [clandestinely] introduced or attempted to be introduced into the United States contrary to law". The statutory definition of "merchandise" as "chattels of every description" including "merchandise the importation of which is prohibited" (19 USC § 1401 [c]) is certainly broad enough to include gambling records (cf., 19 USC § 1496 ["articles"]).

On the basis of the foregoing Federal laws, I believe that the Customs officer had clear statutory authority to seize the records. Gambling records are contraband under any plausible interpretation of Federal criminal statutes and Customs laws, and the papers in question were lawfully seized by the Customs officer based upon his reasonable suspicion that they constituted gambling records unlawfully imported by defendant (see, 19 USC § 482). It makes no difference that the Customs officer, after photocopying the records and returning the originals to defendant, later forwarded them to State authorities. The Fourth Amendment focuses on the encounter between the Customs agent and the defendant, and whatever happened later could not divest the encounter of its character as a "border search", nor retroactively invalidate the seizure.

FALLON, CALLAHAN and DOERR, JJ., concur with GREEN, J.; DENMAN, P. J., dissents and votes to affirm in a separate opinion.

Judgment reversed, on the law, motion to suppress granted, and indictment dismissed.